# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

                Plaintiff,      :      Case No. 3:16-cr-160

                                                  District Judge Thomas M. Rose
- vs -                                    Magistrate Judge Michael R. Merz

ELSTARHEEM MURRAY,

                Defendant.      :

## REPORT AND RECOMMENDATIONS

This case is before the Court for initial review of Defendant Murray's *pro se* Motion to Vacate pursuant to 28 U.S.C. § 2255 (ECF No. 88). Rule 4 of the Rules Governing § 2255 Motions provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States to file an answer, motion, or other response within a fixed time, or take other action the judge may order.

All post-judgment motions collaterally attacking criminal convictions at the Dayton seat of court are referred to the undersigned for a report and recommendations on disposition, pursuant

to General Order Day 13-01.  Final disposition of the Motion to Vacate in this case remains with District Judge Thomas M. Rose.

Defendant pleads three grounds for relief.

> **Ground One:**  Ineffective assistance of counsel:  Counsel did not address the racial bias in the case.
>
> **Supporting Facts:**  Page 47. suppression hearing, Q. "they have out-of-state plates.  They are not white. Why don't they call you and say, hey, why don't you follow them and see if you observe a traffic violation? Why isn't that the protocol? A. That is normally how we would operate. In a scenario. "
>
> As we all know now!, the racial bias in the law enforcement agency state and federal is under review by the leaders in Congress.
>
> **Ground Two:**  Violation of due process.  Second traffic stop violated the Defendants due process rights.
>
> **Supporting Facts:**  Defendant was already pulled over once, searched, questioned, NCIC checked, and cleared to go before he was detained again for obvious bias reasons.
>
> **Ground Three:** Violation of the Defendant's Sixth Amend[ment] right to counsel
>
> **Supporting Facts:**  Clearly the second stop was purely to detain the Defendant, which at that point the Defendant had a right to counsel, which he was never informed of by Law Enforcement.

2

**Litigation History**

Defendant was indicted December 15, 2016, and charged with one count of conspiracy to possess stolen United States mail and to commit bank fraud (Count One) and actual possession of stolen mail (Count Two)(Indictment, ECF No. 12). Defendant's Motion to Suppress was heard on March 21, 2017 (Minutes, ECF No. 24; Transcript, ECF No. 26). After briefing, Judge Rose denied that Motion on June 8, 2017 (ECF No. 35). On August 11, 2017, Defendant withdrew his former plea of not guilty and entered a conditional plea of guilty to both counts (Minutes, ECF No. 38; Transcript, ECF No. 55). The guilty plea was pursuant to a written Plea Agreement which was filed at the same time as the plea was taken in open court (ECF No. 42). After reviewing a presentence investigation report, Judge Rose sentenced Defendant on March 18, 2018, to fifty-four months imprisonment on each count, to be served concurrently (Minutes, ECF No. 57, Judgment, ECF No. 59; Transcript, ECF No. 71).

Defendant appealed to the Sixth Circuit which affirmed this Court's denial of the Motion to Suppress and therefore the guilty plea. *United States v. Murray*, Case No. Case Nos. 18-3083/3241 (6th Cir. Apr. 25, 2019)(unpublished; copy at ECF No. 74). Defendant sought review in the Supreme Court of the United States, but that Court denied certiorari October 7, 2019 (Notice, ECF No. 78). Defendant then timely filed his motion to Vacate by depositing it in the prison mail system June 18, 2020.

## Analysis

**Ground One:  Ineffective Assistance of Trial Counsel**

In his First Ground for Relief, Murray claims he received ineffective assistance of trial counsel because his attorney "did not address the racial bias in the case."  In his Supporting Facts he refers to the Motion to Suppress hearing and notes that racial bias in law enforcement in currently a priority for consideration in Congress.

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.  In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice.  *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome." 466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing Strickland, supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. Id., at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the

5

> difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id*., at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The likelihood of a different result must be substantial, not just conceivable. *Id*., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

Defendant Murray identifies himself as an African-American male (ECF No. 84). He was represented in this case from the day the Complaint was filed (December 1, 2016) by Anthony Van Noy, a prominent and highly-experienced African-American attorney with expertise in criminal defense. Attorney Van Noy was appointed to the case from the Court's Criminal Justice Act panel. Co-defendant Born Murray also received appointed counsel from the Federal Defender's Office.[1]

Murray was convicted on the basis of stolen mail recovered from the vehicle in which he was a passenger and his brother and co-defendant, Born Murray, was driving. About an hour before the traffic stop that yielded the critical evidence, the Murray brothers had been stopped by the same Ohio Highway Patrol Trooper; at that time Elstarheem was driving and his brother was the passenger. Since neither brother had any right to possess any of the recovered checks, a successful defense obviously depended on getting the seized evidence suppressed.

To that end, Mr. Van Noy promptly filed a Motion to Suppress evidence seized from the vehicle in which Murray was riding just before he was arrested, asserting that there was no probable cause for stopping the vehicle or searching it without a warrant (ECF No. 21). Because there was neither an arrest nor a search warrant, the Government had the burden of proving there was probable cause and it presented evidence first.

---

[1] The Court will ordinarily not appoint the Public Defender to represent co-defendants in the same case because of possible conflicts of interest.

The Government's first witness was Ohio Highway Patrol Officer Joseph Weeks who made both traffic stops at issue. He testified that since July 2016 he had been assigned to a multi-agency task force known as the Miami Valley Bulk Smuggling Task Force as the handler of a narcotics-detection dog (Transcript, ECF No. 26, PageID 83). He testified his "function with the task force is to be the marked unit, to make and conduct traffic stops and field interviews." *Id.* at PageID 84. On the morning of November 29, 2016, it was reported to him that undercover agents of the task force observed the Murray brothers leave the Comfort Inn on Miller Lane north of Dayton and travel south on Interstate 75. *Id.* The undercover agents then reported to Weeks that they believed the Murray brothers were headed for the west side of Dayton, a "high-trafficking crime area." *Id.* at PageID 86.

During the course of following the Murray brother, Detective Josh Walters advised Weeks that he had observed a traffic violation committed by the driver of the vehicle in which the Murray brothers were traveling, to wit, an unsignalled lane change on Interstate 75 near the Main Street on-ramp. *Id.* Between one and two minutes later, Trooper Weeks stopped the vehicle based on that reported violation. *Id.* at PageID 87. Weeks stopped the vehicle on the paved shoulder of I-75 between the Main Street and West Third Street exits. *Id.* at PageID 88. Elstarheem Murray was driving and his brother was in the right front passenger seat. Asked for his driver's license, Elstarheem, admitted that he did not have one and produced his North Carolina state identification card, allegedly "laughing nervously." *Id.* at PageID 89.

Because Murray did not have a license, Weeks ran a LEADS check and learned that Murray had "convictions" for narcotics violations. *Id.* at PageID 90. Weeks then requested Dayton Police to have a narcotics dog do a "free-air" sniff. *Id.* at PageID 91.

7

Elstarheem Murray claimed he was driving because he had to get his brother to medical treatment because he was having an asthma attack; Born Murray said instead that it was a kidney problem. Weeks did not arrest Elstarheem for driving without a license, but cautioned him and insisted Born Murray drive, pointing out the location of Grandview Hospital from where they were stopped[2]. *Id.* at PageID 92.

Despite this release, undercover agents continued their surveillance and found that the brothers did not go to the hospital, but returned to the Comfort Inn and put their luggage into a different rental vehicle. *Id.* at PageID 93. This new vehicle was then followed as the first had been. The driver made a right turn on red without completely stopping. Another undercover officer who observed this infraction reported it to Trooper Weeks who again stopped the Murray brothers. Born Murray was driving and Weeks asked him back to his cruiser, telling Elstarheem to stay put. Instead, Elstarheem fled on foot, but was quickly apprehended. *Id.* at PageID 99-100.

Because the narcotics-detection dog had alerted on the vehicle, it was searched at which time the evidence which led to charges – stolen checks – was recovered. *Id.* at PageID 102-03,

Born Murray's trial attorney, Assistant Federal Defender Thomas Anderson, took the lead in cross-examining Trooper Weeks *Id.* at PageID 110-47. It was during his cross-examination that Mr. Anderson spoke the words that Defendant relies on to show there was a racial issue that should have been pursued.

> Q. Why don't they call you and say, listen, we have a hunch. I mean, these guys are in a hotel.
>
> A. Um-hmm.

---

[2] The Court takes judicial notice that Grandview hospital is plainly visible from the portion of Interstate 75 where the traffic stop took place.

8

> Q. They have out-of-state plates. They are not white. Why don't they call you and say, hey, why don't you follow them and see if you observe a traffic violation? Why isn't that the protocol?
>
> A. That is normally how we would operate. In a scenario, the defendants were going to an area that is also known to be a high-risk and high-drug-activity area. They wanted a stop conducted to interview them just to see if they were -- basically to dispel any suspicions that they had.

*Id.* at PageID 121. In other words it is Anderson who suggested that the undercover agents could just have given a non-white racial description and mentioned that the suspects are coming from a hotel and have out-of-state plates and ask that they be followed until they committed a traffic violation and could be stopped. Nowhere does Trooper Weeks himself state that the undercover agents used the "non-white" descriptor. The relevant facts are also the particular hotel they are coming from and the "high trafficking" area to which the undercover agents believe they are headed. *Id.* at PageID 122.

In his Memorandum in Support of the Motion to Suppress, Mr. Van Noy noted "Trooper Weeks candidly acknowledged that this traffic stop was not really about issuing a citation for a traffic infraction, but rather, was a pretext to further a criminal investigation." (ECF No. 30, PageID 212, citing Tr. at 56, PageID 130.) Raising the possibility of racial profiling, Mr. Van Noy argued:

> The State provided evidence of nothing more than an inarticulate hunch that something might be afoot preceding this [initial] stop. Moreover, it would be constitutionally impermissible to stop and detain everyone leaving a motel in a rental car headed toward west Dayton. **Such actions further promote racially motivated detentions.**

*Id.* at PageID 215 (emphasis supplied). He stated that

> The relevant question, therefore, is whether the Task Force had an objective and particularized basis for their suspicions that was reasonable and sufficient to justify the prolonged nature of the second intrusion. This determination is made by considering the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981).

*Id.* at PageID 216.

In denying the Motion to Suppress, Judge Rose noted the essential admission that the traffic stops were pretextual, but held "[t]he reasonableness of a traffic stop does not depend on the motivations of an officer and so long as an officer has probable cause to believe a traffic violation has occurred a resulting stop does not violate the Fourth Amendment." (Entry and Order, ECF No. 35, PageID citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996), and *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)).

On appeal, the Sixth Circuit relied on the same standard:

> The Murrays do not argue that the traffic stop was unlawful at its outset—nor could they. Though Weeks admits the traffic violation was pretext to fish for drug-trafficking evidence, the constitutional reasonableness of the brothers' detention turns on Weeks's objective justifications, not his subjective motivation. *Whren v. United States*, 517 U.S. 806, 813–14 (1996). Born's failure to obey a red light suffices to render the stop lawful under the Fourth Amendment at its initiation. See *United States v. Copeland,* 321 F.3d 582, 593 (6th Cir. 2003).

(ECF No. 74 at PageID 540.)

Thus Mr. Van Noy had framed the issue in the precise terms Judge Rose and the Sixth Circuit found were relevant: did Trooper Weeks have probable cause to believe Born Murray had violated the traffic law by turning right on red without coming to a complete stop? Weeks based the stop on the report of another officer who was an eyewitness to the violation, which was

10

proper, as Judge Rose found, under the "collective knowledge" doctrine (ECF No. 35, PageID 255, citing *United States v. Lyons*, 687 F.3d 754, 766-67 (6th Cir. 2012).

It is clear that the undercover officers wanted the Murray brothers stopped so that they could investigate whether they were involved in narcotics trafficking. They had a "hunch" -- a suspicion based on circumstantial evidence – that the brothers were engaged in narcotics trafficking. Murray seems to be arguing that he could have won the Motion to Suppress if Van Noy had addressed "the racial bias" issue in this case, but the Magistrate Judge in unpersuaded.

We do not know all the factors on which the undercover agents based their suspicion. None of them admitted that the race of the Murray brothers was a factor that they thought supported their suspicion. While the Murray brothers are African-American, there were other admitted facts on which they relied.

First is their stay at the Miller Lane Comfort Inn. From long experience in issuing narcotics search warrants, the Magistrate Judge knows that the hotels on Miller Lane are the locus of a great deal of narcotics trafficking[3]. The Comfort Inn in question (as well as other hotels on Miller Lane) lies adjacent to the intersection of Interstate 75 and Interstate 70. The nearby town of Vandalia, Ohio, lays claim to the title "Crossroads of America" because the predecessors of those two highways, U.S. Routes 25 and 40, meet in downtown Vandalia. Miller Lane is also only a few miles from the Dayton International Airport. Miller Lane is a very active commercial area with many restaurants[4] and other businesses, but it also has been one of the busiest bulk narcotics trafficking locations in the Dayton, Ohio, area for many years.

---

[3] These warrants have been as frequently for Hispanic and Caucasian suspects as for African-Americans.
[4] Born Murray's attorney, Thomas Anderson, noted that he has lunch there frequently, suggesting that there is nothing suspicious about the locale.

11

Because of the pervasive implicit or subconscious bias in this country against African-American males, it is reasonable for anyone to ask, when an African-American male is subjected to a pretextual stop by the police, whether the decision to stop is influenced in some way by that bias. See Jennifer L. Eberhardt, Biased: Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do. Indeed, Eberhardt reports many studies of the ways in which unconscious bias against African-American males affects the behavior of people who believe they are not biased or sincerely wish to avoid acting on that bias. She details incidents, tragically repeated since the book was published in 2019, where that unconscious bias has led to fatal police shootings.

But it is not the law that evidence derived from a traffic stop can be suppressed because the officers involved may harbor an unconscious bias against the driver on account of his race. Murray is silent on what more he believes Mr. Van Noy should have done to pursue the issue of racial bias in the case. Putting the undercover agents on the stand and asking them questions to show they harbor bias against African-Americans would likely have produced denials. But even if he had obtained admissions, that would not likely have resulted in winning the Motion to Suppress. As the *Whren* case holds, the subjective opinions or attitudes of arresting officers will not result in suppression if there is objective evidence of a violation of the law, even so minor a violation as making a right turn on red without completely stopping.

As Murray points out, there is a great deal of discussion in the country today about racial bias in policing as well there should be. The practice of stopping African-Americans merely for "driving while black" is widespread and unjust. But the Murray brothers were not stopped for driving while black. They were stopped the second time because of the hotel from which they came in a second rental car with out-of-state plates after Weeks had ascertained that they each had prior felony convictions and they had misled the police about seeking medical help. The

12

Magistrate Judge accepts that the stop was a pretext for investigating further and that minor traffic infractions are a frequent pretext for stopping African-Americans, sometimes only to enforce residential segregation by reminding black people that they do not "belong" in certain suburbs. But that is not what happened here. It was not deficient performance for Mr. Van Noy to fail to argue that the police officers involved were biased against African-Americans because such a contention, even if proved, would not have resulted in suppressing the evidence.

Murray's First Ground for Relief is without merit and should be dismissed.

**Ground Two: Violation of Due Process Rights**

In his Second Ground for Relief, Murray claims his due process rights were violated by the second traffic stop which he says was obviously for biased reasons.

This claim should be dismissed as barred by Murray's procedural default in failing to present it either in this Court or in the Sixth Circuit

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S.

13

72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87. The procedural default analysis of *Wainwright* and its progeny is fully applicable to § 2255 motions. *United States v. Frady*, 456 U.S. 152 (1982); *Kaufman v. United States*, 394 U.S. 217 (1969); *Ratliff v. United States*, 999 F.2d 1023 (6th Cir. 1993).

Because Murray did not raise this issue in this Court or on appeal, it is procedurally defaulted and should be dismissed on that basis.

Alternatively, this claim should be dismissed on the merits. There is simply no Supreme Court precedent holding that it is a violation of due process to stop a driver for one traffic violation when he or she has been stopped earlier on the same day for a different violation. Drivers do not get a 24-hour pass to violate the traffic law just because they have been stopped once.

Murray claims that it is obvious that the second stop was motivated by racial bias. Not so. At the first stop the Murray brothers had dispelled the original suspicion by claiming Born needed medical attention. Apparently Trooper Weeks believed them and let them go. But the undercover officers immediately observed that they did nothing to obtain medical assistance, but returned to the Comfort Inn, switched vehicles, and placed their luggage in the new vehicle. Those facts reasonably resurrected the original suspicion and added the question, why lie about needing medical attention?

The Second Ground for Relief should be dismissed with prejudice as procedurally defaulted and also without merit.

14

**Ground Three:  Denial of Sixth Amendment Right to Counsel**

In his Third Ground for Relief Murray contends his Sixth Amendment right to counsel was denied when he was detained at the time of and after the second stop and not informed of his right to an attorney.

Ground Three should also be dismissed as procedurally defaulted:  it was never raised in this Court or in the Sixth Circuit on appeal.

Furthermore, the Sixth Amendment right to counsel only attaches when formal proceedings are commenced.  the constitutional right to counsel attaches only upon the initiation of adversary judicial proceedings, such as formal charge, preliminary hearing, indictment, information, or arraignment.  *United States v. Gouveia*, 467 U.S. 180 (1984); *Kirby v. Illinois*, 406 U.S. 682 (1972)(no right to counsel in a pre-indictment line-up).  The right becomes applicable only when the government's role shifts from investigation to accusation.  *Moran v. Burbine*, 475 U.S. 412 (1986).  Here Murray was appointed counsel at the same time as his initial appearance before Magistrate Judge Newman (ECF No. 6).

As with Ground Two, so also Ground Three should be dismissed as procedurally defaulted and without merit.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends the Motion to Vacate be dismissed with prejudice.  Because reasonable jurists would not disagree with this

15

conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

June 24, 2020.

s/ *Michael R. Merz*<br>United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.